## PRENTICE *v.* STEARNS and others.

*(Circuit Court, D. Minnesota. June 24, 1884.)*

1. **LAND—TREATY WITH INDIANS—CONVEYANCE—TITLE.**
   A treaty between the United States and an Indian tribe having been fulfilled by a conveyance of land, no question can arise as to the character of the conveyance,—whether a gift, donation, or grant for value.

2. **SAME—DESCRIPTION—MISTAKE.**
   An appointment by an Indian chief of a party to receive title to certain land intended to be conveyed under treaty, may be valid; but, unless the conveyance describes the land as it really lies, no title to it can pass to the appointee, whatever may have been the Indian's impression as to what its situation was.

3. **SAME—RIGHT OF APPOINTEE TO SELL—ACCURACY OF DESCRIPTION.**
   The appointee of an Indian chief to receive title to certain land may afterwards absorb the interests of his co-beneficiaries; but, in a subsequent conveyance by him, he must use language appropriate to his purpose, or no title will pass.

At Law.

*Rea, Kitchell & Shaw, C. K. Davis,* and *J. W. Willis,* for plaintiff.
*O. P. Stearns, per se; Gordon E. Cole, John M. Gilman,* and *W. W. Bilson,* for defendants.

MILLER, Justice. This is an action of ejectment for land in the city of Duluth. The contest arises out of the reservation or stipulation in the treaty of the thirtieth of September, 1854, between the Chippewa Indians and the United States. That stipulation declares that Buffalo, one of the chiefs of the tribe, should be authorized to

designate some of his relatives who had supported him, who should receive a section of land. It seems that Buffalo, on the day of the making of the treaty, and, of course, before it was ratified by the United States, made an attempt, both to appoint persons who should receive the land, who should be beneficiaries of the donation, if you should call it a donation, or of the reservation, if you should call it a reservation, (I do not think it is material which,) and to designate the land which he assigned to them, which was as follows:

"I hereby select a tract of land one mile square, the exact boundary of which may be defined when the surveys are made, lying on the west shore of St. Louis bay, Minnesota territory, immediately above and adjoining Minnesota point; and I direct that patents be issued for the same, according to the above-recited provisions, to Shaw-bwaw-shung, or Benjamin G. Armstrong, my adopted son, 'and then to the nephew, whose name is given, and to his two sons,'—one quarter section to each."

One of the questions that arises is whether that was a valid selection,—a valid exercise of the power of selection and appointment by Buffalo under that treaty. The treaty was afterwards ratified without qualification in regard to this particular. We are of opinion that, so far as the appointment of the persons to receive this land is concerned, it was a valid appointment; and the right, so far as it could then vest, was vested by that paper in Benjamin Armstrong, and in the other beneficiaries who have conveyed their interest in said land to Benjamin Armstrong, and he has received the patent from the United States for the land under that treaty. Buffalo died before anything was done in the matter. Armstrong undertook to convey to. Frederick Prentice, the plaintiff in the action, an undivided one-half of the section of land which had been selected by Buffalo. The United States afterwards, coming through the land-office and interior department, to execute this treaty by making a deed of a section of land, found a difficulty in locating it under Buffalo's directions. I do not know whether the difficulty was insuperable; probably it was. It was easy to see that a large discretion was left in the officers of the United States, because both the treaty and Buffalo's directions say, "the boundary of which may be defined when the surveys are made." It was therefore dependent upon future surveys, whether that meant regular congressional surveys of land for public purposes, or whether it meant a special survey of the land of Buffalo's selection. And the same question goes back to the treaty, whether Buffalo was to select a section after these surveys were made, or whether he was to select the amount of a section, which is a square mile. These are questions which are not easy to solve, neither is it necessary to do so. In either event we think that the treaty was valid, and we think that the patent which the United States, after encountering these difficulties, made to Armstrong of certain parts of sections regularly surveyed, as found in the congressional plats and surveys of the United States, was a valid execution of the treaty. And as the patent issued to Arm-

strong under that selection of the United States, and as appears by the correspondence accepted by Armstrong, we are of the opinion that the treaty was fully executed between Armstrong and the United States, and was valid as to them.

Now, that presents the main question in this case; and that question is, whether Armstrong made such a conveyance to Prentice of the undivided one-half of any particular piece of land, or of the interest which he had acquired by what had taken place, so that Prentice could recover this specific piece of land in ejectment. That is the main question, and the one upon which we feel ourselves compelled to decide this case.

It will be remembered that the deed from Armstrong to Prentice was made on the eleventh of September, 1856, two years after the treaty was made,—after Buffalo had made Armstrong the appointee of what he was to receive from the government, and after he had made his attempt at the selection of the land; which selection was described as "a section one mile square, the exact boundary of which may be defined when the surveys are made, lying on the west shore of St. Louis bay, Minnesota territory, immediately above and adjoining Minnesota point." Now, Armstrong conveys to him "the undivided half of the following described piece or parcel of land," which language itself is important; he conveys to him the undivided one-half of the following described piece or parcel of land, situated in the county of St. Louis and territory of Minnesota, described as follows:

"Beginning at a large stone or rock at the head of St. Louis river bay, nearly adjoining Minnesota point; commencing at said rock, and running east one mile, north one mile, west one mile, south one mile, to the place of beginning; and being the land set off to the Indian chief, Buffalo, at the Indian treaty of September 30, 1854, and was afterwards disposed of by said Buffalo to said Armstrong, and is now recorded in the government documents."

The main question to be decided here is whether this is an attempt to convey the specific piece of land one mile square, definitely located, and supposed to have come to Armstrong through means of the treaty and the appointment of Buffalo, or whether the true meaning of it was that it was intended to convey such interest as Buffalo had acquired and had transmitted to Armstrong, whatever that interest might be, and wherever it might be found, whether it was one square mile *in solido,* or whether it was one square mile taken in different sections and subdivisions. Because if it was the purpose of Armstrong to convey to Prentice this specific piece of land by metes and bounds, of which the location was known and understood, or supposed to be known and understood, then the plaintiff, suing upon this deed, and nothing else,—which does not describe the land in controversy between the parties to the suit,—cannot recover, because the deed does not describe the particular land,—the specific land, or piece or parcel of land,—now held by defendant. It is not the piece or parcel

of land which this plaintiff is suing for, and which this defendant is charged with being in possession of. On the other hand, if it was an attempt to convey the interest, whatever it was, that had come to Armstrong by reason of the treaty, and by reason of the action of Buffalo under it, then another consideration prevailed, and we can inquire whether the plaintiff is in a position to question the title to that unascertained piece of land. The consideration, outside of the language of the deed, is very strongly in favor of the first view, and is repelled by nothing in it, that the parties intended to convey, and understood the deed described a piece of land, so that it could be identified. The presumptions are very strong, and the language is in favor of this view. The deed describes a mile square, with a given starting point, which can be identified, and which has been identified in this proof. And then, taking into consideration the language, "Commencing at said rock, and running east one mile, north one mile, west one mile, south one mile, to the place of beginning." This is a specific description of a described piece or parcel of land. This is a piece of land that a surveyor can go to to-morrow and lay off easily, by showing him the rock which was proved to be at an ascertained point. He can go there and lay it off easily, (except that it runs into the water,) and he can make that selection of the section of land described there, and make a survey of it, and it will not touch the land in controversy by half a mile. It therefore requires the entire rejection of that first part of the description as so much surplusage, and as inconsistent with what the plaintiffs now claim, in order that we may find the sufficiency of that deed. The language following does not fairly negative that; it merely implies that this section of land which we have above described,—this mile square,—it is "the lands set off to the Indian chief Buffalo, at the Indian treaty of September 30, 1854, which was afterwards disposed of by said Buffalo to said Armstrong, and is now recorded in the government documents." If we read that, as it seems to me it should be read, that on that date, Buffalo having first made the treaty, and made the selection of the mile square, according to the description of his selection which we have read,—which does not mention the rock, nor does it mention the lines east and west, but undertakes to describe where it is by saying, "that it is lying on the west shore of St. Louis bay, Minnesota territory, immediately above and adjoining Minnesota point,"—now, if we suppose that when Armstrong undertook to convey the undivided half of his property to Prentice that no government surveys had been made, no attempt made to identify the land, that Armstrong as well as Buffalo were satisfied at the time of making the designation that he had designated a mile square of land within that treaty limits, which could be easily ascertained and laid off by the surveyors when they come to make the United States surveys, and that Armstrong was undertaking to convey that piece of land so selected, and you have all that is necessary to fill every requirement

of the descriptive part of this grant. But there is no description of the land, except the implication which may arise from the language in the deed, which conveys to Prentice whatever may be coming to Armstrong by reason of this transaction. This is the meaning of the language, and to put any other construction upon it is to strain a point, and to suppose it possible to strike out that first portion of the deed which gives a clear description of the land and its location and boundaries.

Without elaborating this view of the subject, we are of the opinion that that deed from Armstrong to Prentice conveys no interest in the land in controversy here upon which the action of ejectment can be sustained. We further find that this deed to Prentice, which we find did not convey the land, is otherwise a good deed. There is an objection to the want of two witnesses, but that is cured by a subsequent act of the Minnesota legislature. And we are of opinion that it was sufficiently acknowledged to have admitted it to record, and was so acknowledged and recorded, so that, with regard to the deed, its only defect was its want of description.

We are of the opinion that, under the statutes of Minnesota, the deed made by Mr. Gilman, under which the defendants claim, is merely a quitclaim deed. It is equivalent to the conveyance of such interests as Armstrong had when he made it. Secondly, if Armstrong, as we find, had conveyed the other undivided one-half by a valid deed for the land now in controversy, Mr. Gilman and his grantee would take nothing under his conveyance, because Armstrong had nothing to convey. But since the grantees under Gilman, the defendants, are in possession, it is for the plaintiff to show that he himself has a good title. He has not made out any title to this particular piece of land, and he is in no condition to inquire into defects in the defendant's title.

We are of opinion, in the first place, as to the law of the case, that the treaty, having been fulfilled by the United States by the conveyance of the land, that no question arises about there being a donation, or gift, or grant for value, or anything of that kind. Secondly, we are of opinion that Buffalo's attempt in the designation and appointment, as to the appointment was valid. In point of fact, that the United States never granted, and never pointed out, that particular piece of land which it seems he supposed he had selected. In the third place, we are of opinion that Armstrong, by this conveyance, after he had become entitled to the interest which Buffalo had appointed to all four of them,—that being a quarter section to each,—that that conveyance he made to Prentice might have been a valid deed assigning the undivided one-half of Armstrong's interest, under the treaty, had he used language appropriate to that purpose, but that he did not do so. We also find that the undivided half of this property is worth the sum of $10,000.

Judgment is ordered for the defendants.